J-A26002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DANIEL A. JACOBS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NIKOLE LOUGHERY | : | |
| | : | |
| Appellant | : | No. 558 WDA 2024 |

Appeal from the Order Entered April 10, 2024
In the Court of Common Pleas of Greene County Civil Division at No(s):
854 of 2019

BEFORE:  BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BOWES, J.:                    **FILED: January 23, 2025**

Nikole Loughery ("Mother") appeals the April 10, 2024 order that, *inter alia*, awarded Daniel A. Jacobs ("Father") (collectively, "Parents") primary physical custody of Parents' daughter, J.J., born December 2018.  We affirm.

The certified record indicates that Parents' relationship was relatively brief and that they never married.  They lived together in Father's apartment in Oakdale, Allegheny County, Pennsylvania, for approximately one year until January 2019.  *See* N.T., 2/15/24, at 48-50, 158-60.  Thereafter, Mother moved to Mount Morris, Greene County, Pennsylvania for eight months and then relocated to Maidsville, West Virginia without informing Father.  *See id*. at 50-51, 162-63.

On October 9, 2019, Father initiated this custody litigation in Greene County by filing a complaint requesting shared physical and legal custody of J.J.  Although Mother had recently completed her undisclosed move to

Maidsville by that date, she did not object to venue or challenge the jurisdiction of the trial court in Greene County. The following month, Parents entered a consent order providing Mother primary physical custody of J.J., while granting Father periods of partial physical custody "every other weekend from 6:00 p.m. Friday until 6:00 p.m. on Sunday." Consent Custody Order, 11/13/19, at ¶ 2. The consent custody order also provided for shared legal custody. *See id*. at ¶ 1.

Mother eventually informed Father of her relocation in December 2019. *See* N.T., 2/15/24, at 162-63. Father responded by filing a motion for contempt, but he withdrew it so that Parents could enter a second consent order that provided for a gradual increase in his physical custody. That July 2, 2020 accord provided as follows:

> 2. Physical Custody. The parties agree to a step-up custody order in 4 phases.
>
> a. During the first phase, Mother shall be the primary custodian of the child. Father shall have the following partial physical custody: Father shall have custody from Thursday at 3:00 P.M. to 3:00 P.M. Sunday in alternating weeks.
>
> b. During the second phase, which shall commence on September 1, 2020, Mother shall be the primary custodian of the child, and Father shall have partial physical custody from 3:00 P.M. on Thursday to 3:00 P.M. on Monday in alternating weeks.
>
> c. During the third phase, which shall commence on November 1, 2020, Mother shall be the primary custodian of the child and Father shall have partial custody from the first Monday of the month at 3:00 P.M. to the following Sunday at 3:00 P.M. and from the third Thursday of the month at 3:00 P.M. to [the] following Monday at 3:00 P.M.

> d. During the final phase, which will commence on January 1, 2021, the parties shall share physical custody on a week-on/week-off basis with custody exchanges taking place at 3:00 P.M. every Friday.

Custody Consent Order, 7/2/20, at 1-2 (unpaginated).

Next, on September 4, 2020, Mother submitted notice of a proposed relocation from Maidsville to Morgantown, West Virginia. Father did not object and the court approved the move. For the ensuing two-year period, the parties successfully co-parented and exercised shared physical custody pursuant to the terms of the July 2, 2020 custody order.

Beginning in September 2022, however, a dispute arose between Parents regarding where J.J. would attend school beginning in 2024. On September 21, 2022, Mother sent a letter to Father averring that she wanted J.J. to attend school in Morgantown. *See* Petition for Modification, 2/16/23, at Exhibit B. While Mother professed a desire to maintain equally shared physical custody between Parents, her letter conceded she was "unsure" how that could be accomplished if J.J. was enrolled at school in Morgantown. *Id*. Father did not agree to Mother's proposed school choice and asserted that J.J. should be enrolled in school in Allegheny County. *See id*. at ¶ 7.

On February 16, 2023, Mother filed in Greene County a petition to modify custody requesting that the court resolve the dispute over J.J.'s prospective school and fashion a new custody arrangement that coincides with that decision. After determining that the filing was premature given the length of time before J.J. would be required to enroll, the court held Mother's petition in abeyance for six months by stipulation of all parties. *See* Order, 3/30/23,

at 1-2. The conciliation failed to produce an amicable resolution of the school choice issue, and the court held a custody trial on February 15, 2024, wherein Parents each testified. During her testimony, Mother revealed that she was pregnant and acting as an "independent" gestational surrogate. *See* N.T., 2/15/24, at 47. As we flesh out, *infra*, Father's ensuing testimony highlighted Mother's sudden disclosure as an example of how he believed Mother "cut [him] out" of important discussions with his daughter. *Id*. at 179 ("[I]t would be nice to be able to have a conversation with [Mother] as to . . . [h]ow is [the surrogacy] being handled with [J.J.]?").

On April 9, 2024, the court filed a custody order that awarded Father primary physical custody of J.J. during the school year, while awarding Mother partial physical custody every other weekend during the school year from "Friday at 6:00 P.M. until Sunday at 6:00 P.M." Final Custody Order, 4/9/24, at ¶ 2. Concomitantly, the custody order provided that Mother would have primary physical custody of J.J. during "the summer months," with Father awarded partial physical custody every other weekend from "Friday at 6:00 P.M. until Sunday at 6:00 P.M." *Id*. Along with the custody order, the court entered an opinion setting forth its specific findings pursuant to 23 Pa.C.S. § 5328(a).

Mother filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court submitted a Rule 1925(a)(2)(ii) statement which referred this Court to the reasoning set forth in the April 9, 2024 opinion.

Mother presents the following questions for our review:

I.      Whether the trial court erred and abused its discretion in exercising jurisdiction and keeping venue of this matter while neither party nor the child has any significant contacts with Greene County, Pennsylvania?

II.     Whether the trial court erred and abused its discretion in awarding [Father] primary physical custody during the school year, in spite of the court's findings that most custody factors, pursuant to 23 Pa.C.S. § 5328[(a)], were neutral, and those that were not found to be neutral were either given "little weight" towards Mother, or were evenly balanced between the parties?

III.    Whether the trial court erred and abused its discretion in granting primary physical custody to Father because he is more financially successful than Mother?

IV.     Whether the trial court erred and abused its discretion in granting preference to Father because Mother is a surrogate mother?

V.      Whether the trial court erred and abused its discretion in granting primary physical custody to Father because Mother "works so little"?

VI.     Whether the trial court erred and abused its discretion in granting primary physical custody to Father because Mother employs full-time childcare for the minor child?

Mother brief at 4-5.  We will address each of these claims *seriatim*.[1]

_____

[1]  On July 22, 2024, Father filed an application to quash Mother's appeal pursuant to Pa.R.A.P. 2101 ("Briefs and reproduced records shall conform in all material respects with the requirements of these rules . . . and, if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed."). Specifically, Father averred that Mother failed to file a reproduced record and simply appended copies of documents from the underlying proceeding to the end of her brief without proper organization.  **See** Application to Quash,
*(Footnote Continued Next Page)*

We begin by addressing Mother's first claim, which facially raises issues of jurisdictional gravity. To the extent that this issue truly touches upon subject matter jurisdiction, our standard of review is *de novo* and our scope of review is plenary. ***See S.K.C. v. J.L.C.***, 94 A.3d 402, 406 (Pa.Super. 2014). We note, however, that "when a trial court possesses subject matter jurisdiction over a child custody dispute, a trial court's decision to exercise that jurisdiction is subject to an abuse of discretion standard of review." ***Id***.

Mother asserts that the trial court lacked "jurisdiction" to modify the existing custody award due to the parties' lack of ongoing contacts with Greene County. ***See*** Mother's brief at 10 ("It was reversible error for the trial

─────────────────────────────────

7/22/24, at ¶¶ 1-5. This Court initially denied Father's application without prejudice to his ability to re-raise the matter. ***See*** Order, 8/9/24, at 1. In his appellate brief, Father has reasserted the same allegations and requested that Mother's appeal be quashed, or that he be granted additional time for briefing due to the absence of a formal reproduced record.

We note with disapproval that Mother's counseled filing fails to conform with essentially all the organizational and technical requirements that our Rules of Appellate Procedure establish for reproduced records. ***See generally*** Pa.R.A.P. 2171-76. Nonetheless, the draconian sanction requested by Father is not appropriate in the absence of any indication that he has suffered prejudice or that the defects impeded our review. ***See***, ***e.g.***, ***Hagel v. United Law Mower Sales & Service Inc.***, 653 A.2d 17, 19 (Pa.Super. 1995) (failure to designate, prepare, or file reproduced record did not preclude meaningful appellate review); ***see also Stout v. Universal Underwriters Ins. Co.***, 421 A.2d 1047, 1049 (Pa. 1980) (advising that the "extreme action" of dismissal should be imposed sparingly and is not appropriate when, *inter alia*, the moving party has not suffered prejudice) (citing Pa.R.A.P 902). Here, Father had the opportunity to file a supplemental reproduced record. Furthermore, he was also provided with additional time in which to file his brief. Father's application is denied.

court to maintain jurisdiction over this case, and it should have been referred to either Allegheny County, Pennsylvania, or Monongalia County, West Virginia[,] for adjudication."). Mother relies upon *J.K. v. W.L.K.*, 102 A.3d 511 (Pa.Super. 2014), wherein this Court reversed the denial of a petition to transfer the venue of a custody case between different Pennsylvania counties pursuant to Pa.R.Civ.P. 1915.2 ("Venue"). *See* Mother's brief at 9-10. Finally, Mother has also referenced provisions of the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") that "allocate jurisdiction and functions between and among the courts of the common pleas of this Commonwealth." *Id*. at 8-9 (citing 23 Pa.C.S. § 5471).

Mother's discussion conflates the distinct concepts of subject matter jurisdiction and venue. While Mother couches her arguments in jurisdictional terms, the legal authority cited in her brief implicates only venue.[2] This Court has helpfully delineated the distinction, as follows:

---

[2] Aside from mentioning West Virginia in passing, Mother has made no attempt to develop any argument that a different state should have subject matter jurisdiction over this litigation. However, mindful that a challenge to subject matter jurisdiction cannot be waived, we examine the record and discern no jurisdictional error in this case. As Pennsylvania was J.J.'s home state pursuant to 23 Pa.C.S. § 5421(a)(1) at the time these custody proceedings commenced, the trial court possessed "exclusive, continuing jurisdiction" to modify its own custody determination until the entry of a judicial finding that, *inter alia*, "neither the child, nor the child and one part, nor the child and a parent acting as a parent have a significant connection with this Commonwealth and substantial evidence is no longer available in this Commonwealth concerning the child's care, protection, training and personal relationships." 23 Pa.C.S. § 5422(a)(1). There is no such judicial finding in
*(Footnote Continued Next Page)*

> Frequently, the terms jurisdiction and venue are used interchangeably although in fact they represent distinctly different concepts. Subject matter jurisdiction refers to the competency of a given court to determine controversies of a particular class or kind to which the case presented for its consideration belongs. Venue is the place in which a particular action is to be brought and determined, and is a matter for the convenience of the litigants. Jurisdiction denotes the power of the court whereas venue considers the practicalities to determine the appropriate forum.

*J.K.*, 102 A.3d at 513 (quoting *In re R.L.L.'s Estate*, 409 A.2d 321, 322 n.3 (Pa. 1979)). This Court has also determined that "the question of which county within this state should decide a particular custody case, when that case is properly within the jurisdiction of this Commonwealth, is a venue question." *Wolf v. Weymers*, 427 A.2d 678, 680-81 (Pa.Super. 1981). Thus, "[f]or purposes of clarity, we will analyze [Mother's] issues in venue terms." *J.K.*, 102 A.3d at 515.

It is well-established that "the right to raise the objection of venue is a mere personal privilege belonging to the defendant which may be waived by that defendant[.]" *Wolf*, 427 A.2d at 680-81 (cleaned up). Moreover, "unlike the question of subject matter jurisdiction, it is generally held that the court

_____

the certified record. Indeed, when Mother filed the underlying petition to modify custody to resolve the dispute over J.J.'s prospective school, J.J. was spending at least one-half her time in Pennsylvania with Father, *i.e.*, six months out of the year. *See* Custody Consent Order, 7/2/20, at ¶ 2(d) (providing for equally shared physical custody beginning on January 1, 2021). This is sufficient to establish the requisite connection with the Commonwealth. *See S.K.C. v. J.L.C.*, 94 A.3d 402, 413 (Pa.Super. 2014) (holding, child spending three months out of year in Pennsylvania had sufficient connection with Commonwealth to establish exclusive, continuing jurisdiction for purposes of § 5422(a)(1)).

on its own motion may not order a change of venue, nor may it dismiss for improper venue." *Id*. at 681; *see also Zappala v. Brandolini Property Management, Inc.*, 909 A.2d 1272, 1284 (Pa. 2006) ("A challenge to improper venue . . . must be addressed before the case proceeds.").

As a threshold matter, it is not apparent that Mother is entitled to object to venue at this juncture because she invoked the trial court as the appropriate forum by filing the underlying petition to modify custody in February 2023. Thereafter, she spent another year litigating her petition without raising any objection to venue. Assuming, *arguendo*, that Mother could have challenged venue in the trial court, she did not. Accordingly, any issue concerning venue is waived.[3] *See Wolf*, 427 A.2d at 681 ("[S]ince the defendant in the present case . . . raised no objection to venue, this issue is not properly before this Court."); *see also* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

The remainder of Mother's claims concern the merits of the trial court's findings. Our standard and scope of review in this context is well-established:

> [We] review . . . a custody order . . . for a gross abuse of discretion. Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.

---

[3] Since Mother's first claim is waived, we express no opinion as to whether venue in Greene County was, in fact, appropriate under these circumstances.

In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Rogowski v. Kirven*, 291 A.3d 50, 60-61 (Pa.Super. 2023) (cleaned up).

As with all custody-related matters, the trial court's "paramount concern is the best interest of the child involved." *Id*. at 61 (cleaned up). To that end, our law provides that a court is only empowered to change an existing custody order if the modification will "serve the best interest of the child." 23 Pa.C.S. § 5338(a). Specifically, § 5328(a) sets forth several factors that a court must consider prior to modifying an existing custody order. *See E.B. v. D.B.*, 209 A.3d 451, 460 (Pa.Super. 2019). While a court's general consideration of these factors is mandatory, "it is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id*. (cleaned up).

These factors provide as follows:

**(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

- 10 -

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).[4] In order to evince proper consideration of these required elements, custody courts must set forth a discussion of these best-interest factors "prior to the deadline by which a litigant must file a notice of appeal." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

Instantly, the trial court provided a timely assessment of the relevant factors in an opinion it filed contemporaneously with its April 9, 2024 order.

_____

[4] At the time of these custody proceedings, the list of factors set forth at § 5328(a) included only the elements set forth above. We note, however, that our General Assembly has enacted significant amendments to these custody factors "pursuant to Act of April 15, 2024, P.L. 24, No. 8 (known as 'Kayden's Law')." *Velasquez v. Miranda*, 321 A.3d 876, 886 n.6 (Pa. 2024). These statutory amendments took legal effect on August 13, 2024, *i.e.*, several months after the trial court issued the instant custody determination.

It is well-settled that "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. § 1926. There is no retroactivity clause included in Kayden's Law. **See generally** PA LEGIS 2024-8, 2024 Pa. Legis. Serv. Act 2024-8 (S.B. 55). Thus, we do apply Kayden's law in this case. **See R.M. v. J.S.**, 20 A.3d 496, 513 n.15 (Pa.Super. 2011) (declining to apply revised statute in proceedings that concluded several months prior to the revisions taking legal effect).

*See generally* Opinion, 4/9/24, at 1-10 (unpaginated). The court determined that the factors at § 5328(a)(3), (4), (12), and (14) favored Mother. It concluded that the factors at § 5328(a)(9)-(11) militated in favor of Father. The remaining factors outlined in § 5328(a)(1)-(2), (5)-(8), (13), and (15) were deemed to be neutral. Finally, the court also identified three ancillary features pursuant to § 5328(a)(16), which inured to the benefit of Father, namely: (1) Mother's failure to acknowledge Father's concerns regarding J.J.'s co-sleeping issues; (2) Mother's failure to inform Father, and include him in the decision of how to advise J.J., that Mother was acting as surrogate mother for another family; and (3) Mother's utilization of full-time, third-party childcare during her custodial time despite working only six to ten hours every week.

Reviewing Mother's remaining appellate claims, she has challenged the appropriateness of the trial court's findings with respect to the factor at § 5328(a)(9) and two of the findings pursuant to § 5328(a)(16), specifically, her failure to advise Father regarding her surrogacy and her reduced work schedule and use of full-time childcare. *See* Mother's brief at 10-19.

With respect to § 5328(a)(9), which addresses which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child, the trial court made the following finding:

> Both parties are capable.
>
> The [c]ourt finds that Father is somewhat better equipped, and thus more likely to maintain such. The parties are very

different people, parent very differently, and likely have different ideas of how this factor can be accomplished.

Father is certainly more stable financially, and in life, than Mother and probably can provide a more stable and consistent environment. Mother and Father are both loving and nurturing.

This factor favors Father.

Trial Court Opinion, 4/9/24, at 6-7 (unpaginated).

Mother has mischaracterized these findings in her arguments by alleging that the trial court predicated its determination solely on Father's superior financial status. *See* Mother's brief at 14 ("[F]inding custody factor nine to favor [Father] simply because he supposedly earns more, although this is not supported by the record, is reversible error."). We must disagree.

As noted above, the trial court did not predicate its findings with respect to § 5328(a)(9) solely upon Father's financial status, but rather upon its overall conclusion that he was generally more stable "in life" than Mother. *See* Trial Court Opinion, 4/9/24, at 7. This finding is supported by the record. Specifically, Father testified that he owns a "transportation, shipping, and logistics company," which affords him steady employment and a free schedule to address J.J.'s everyday needs. *See* N.T., 2/15/24, at 153-54. Father also testified that his living situation has been stable and unchanged for approximately twenty years. *See id*. at 164, 172-73.

In contrast, Mother is a "self-employed" massage therapist and doula with an inconsistent schedule. *Id*. at 46-47. She only works "six to ten hours a week," yet she was also regularly "on call" for her pregnant clients who were

nearing full term. *Id*. More importantly, Mother moved three times since the breakdown of her relationship with Father, at one point absconding to West Virginia without informing Father or seeking court approval. *Id*. at 49-50, 72, 107.

It is evident that the trial court's finding with respect to § 5328(a)(9) was a close determination, as it concluded that both Parents were capable, loving, and fit with respect to J.J. Nonetheless, its holding that Father was generally more stable and well-situated to care for J.J. was supported by the certified record. According to our standard of review, we may not disturb this finding. *See Rogowski*, 291 A.3d at 60-61.

Next, pursuant to § 5328(a)(16), the trial court also found that Mother's failure to include Father in the process of informing J.J. regarding Mother's status as a gestational surrogate weighed in favor of Father being awarded primary physical custody. The court reasoned as follows:

> [T]he surrogacy that Mother has engaged is troubling, mainly from the standpoint of making the unilateral decision, not telling Father, and not recognizing that Father might have viable concerns about how this might affect the child. Again, this is not determinative, but shows a general lack of judgment regarding co-parenting that is concerning.

Trial Court Opinion, 4/9/24, at 9 (unpaginated). Mother argues that the trial court's finding on this point was improper and alleges that the trial court was trying to force Mother to seek Father's leave to become a surrogate. *See* Mother's brief at 15 ("While the trial court does not explicitly say that it believes [Mother's] decision to be a surrogate to be immoral, the trial court

expresse[d] a general disdain that Mother would do so without asking [Father's] opinion or permission on the matter."). Respectfully, we find that Mother has misrepresented the nature of the trial court's findings.

As noted *supra*, Mother disclosed that she had become an "independent" gestational surrogate, for the first time, at the February 2024 custody trial. **See** N.T., 2/15/24, at 47. By this time, Mother averred that she had already informed and shared information with J.J. regarding surrogacy over "a couple years." **See id**. On cross-examination, Mother confirmed that she made a conscious decision to withhold this information from Father since he had previously expressed opposition to similar arrangements in the past. **See id**. at 77-78 ("My doula was a surrogate and [Father] stated that he was very against it. . . . Quite frankly I was afraid of how he would handle it.").

Father articulated his concerns regarding surrogacy, as follows:

[W]e found out today that [Mother] was pregnant. Completely cut out of that decision. I mean, she's a grown woman; she's allowed to do what she wants to with her body. But she shares a child with me and -- that's something to take into consideration over the course of the nine months. And it would be nice to be able to have a conversation with [Mother] as to – God forbid what if something happens? What should we do, as parents, if something happens to her during this pregnancy? Not saying that anything's going to happen, but what if something does? What's the emergency plan? How is it being handled with [J.J.]? Is [J.J.] going to miss this child when she gives birth, and the child goes with its real parents? Is [J.J.] going to be asking a lot of questions? Is it something that, you know, we as coparents should be discussing? Once again, just a decision that's, you know my involvement wasn't even comprehended, and I don't understand that.

*Id*. at 179. As to his role in the discussion with J.J., Father opined,

- 16 -

I think that [Mother's decision] would have warranted a conversation between her and I saying . . . [h]ow do you think we should approach [J.J.] about it? [For example, y]ou know, I've been thinking along this line; here's what I'm thinking. You take this [information] home, think about it, and maybe next week when [J.J. is] with you, you can talk to her about it. But, you know, it's not the first time that a decision has been made [without me].

*Id*. at 180.

At the conclusion of the hearing, the trial court credited Father's testimony and explained that its misgivings regarding Mother's decision not to inform Father was not grounded in distaste for Mother's profession, but a concern that she made a conscious decision not to involve Father in such a critical co-parenting discussion:

I think you absolutely should have discussed the surrogacy. I think it is a huge issue and how this affects a five-year-old. I think that those are the kinds of things that – never dealt with it before, but with a five-year-old daughter, sure, you can decide what you want to do, but, you know, obviously, she's going to have a lot of questions, and I think talking with him about it – and what I say to a lot of people is, like, what you all decide to do for work or how to raise your child or whatever, it's a hundred percent your choice and none of my business, until you split and until there's a custody action initiated. And then you don't have the luxury of deciding on doctors unilaterally, those kinds of things.

*Id*. at 215-16.

We observe no basis to disturb the trial court's findings. Notwithstanding Mother's protestations, the trial court did not penalize Mother for choosing to act as a surrogate parent. Rather, the court believed that Mother discounted the potential impact of her decision on J.J. and it disfavored Mother's conscious choice to exclude Father from the process of informing

- 17 -

their daughter of that decision because she objected to his anticipated reaction. Insofar as Father was entitled to participate in that conversation with J.J. from a co-parenting standpoint, the record supports the court's finding that Mother's exclusionary behavior militated against her. No relief is due.

Finally, Mother has also challenged the trial court's findings pursuant to § 5328(a)(16) that addressed credibility issues regarding Mother's testimony concerning her work hours and use of full-time childcare. Specifically, the court made the following determination: "Lastly, the [c]ourt fails to be able to understand how someone who works so little and employs full time care for her child can take the position that she is, and should remain, the primary caregiver. There were no credible explanations for this and it is perplexing." Trial Court Opinion, 4/9/24, at 9-10 (unpaginated). Mother alleges that the trial court's findings are not supported by the evidence of record. *See* Mother's brief at 17-19. We must disagree.

Initially, Mother testified that she does not utilize third-party childcare "very often." N.T., 2/15/24, at 61. Subsequently, however, Mother averred that she sends J.J. to a professional daycare on Monday, Wednesday, and Friday from 8:00 a.m. until 3:30 p.m., as well as regularly relying upon additional coverage from her mother, childhood friends, and other mothers with whom she "exchanges childcare." *See id*. at 61, 80. Overall, we agree with the trial court that Mother's testimony concerning her use of childcare

was not consistent, as she utilized a significant amount of childcare on a weekly basis despite her claims to the contrary.

Dovetailing with these concerns, Mother's testimony regarding her work schedule also played into the trial court's concerns regarding childcare. Specifically, Mother testified that she only works approximately "six to ten hours" every week. *See id*. at 46-47. There is some tension, however, between this testimony and her claims that she was "on call" for all her clients who were close to giving birth. *See id*. Furthermore, it remains unclear why Mother would need to rely upon as much childcare assistance as she currently does given her apparent availability. While Mother claimed that she enrolled J.J. in professional daycare merely to prepare for entry into kindergarten, the trial court was not required to credit her explanation. *See* N.T., 2/15/24, at 80; *Rogowski*, 291 at 60-61.

Based upon the foregoing, we see no reason to overturn the trial court's credibility determinations with respect to Mother's testimony. Hence, we do not disturb the court's findings pursuant to § 5328(a)(16).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 01/23/2025

- 19 -